| UNITED STATES OF AMERICA, | ) No. |
| --- | --- |
| Plaintiff, | ) |
| vs. | ) **AFFIDAVIT OF** |
| | ) **XXXXXXXXX IN SUPPORT** |
| $443,495.00 IN UNITED STATES CURRENCY, | ) **OF VERIFIED COMPLAINT** |
| | ) **FOR FORFEITURE IN REM** |
| Defendants(s). | ) |

I, David A. Rose III being duly sworn, depose and state as follows:

1. I am a Special Agent with the Drug Enforcement Administration (hereinafter referred to as DEA) assigned to the Anchorage District Office. I have been employed by the Drug Enforcement Administration since December 2018. Prior to employment with the DEA, I was employed as a contractor with DEA working in the DEA's Asset Forfeiture Program and prior to that I was employed as an Insurance Fraud Investigator. In 2015 I earned a Bachelor's of Science Degree in Criminal Justice with a concentration in Investigative Services, a Minor in Legal Studies, and a Certificate in Forensic Computer Investigations from the University of New Haven. During the course of my training with the DEA, I received training and practical experience in conducting investigations of controlled substances violations in conjunction with agents and officers from other jurisdictions. I have conducted and assisted in investigations which have led to the arrest and conviction of persons for violations dealing with sales, and possession of cocaine, heroin, fentanyl, methamphetamine, and other controlled substances, money laundering and the seizure and forfeiture of assets. Through these investigations, I have learned how and why these offenders conduct various aspects of their drug trafficking activities,

to include manufacturing, packaging, distribution, transportation, concealment of controlled substances, and money laundering.

2. In my experience and the experience of other Agents and Law Enforcement Officers with whom I have consulted, I know that the distribution of controlled substances is frequently a continuing activity over months and years. Persons involved in the trafficking of illegal controlled substances typically will obtain and distribute controlled substances on a regular basis, much as a distributor of a legal commodity would purchase stock for sale. Similarly, such drug traffickers will maintain an "inventory" which will fluctuate in size depending upon the demand for and the available supply of the product. It has been my experience that drug traffickers do not always maintain a fully stocked cache of controlled substances at all times, and further, that many traffickers amass drug trafficking proceeds over a period of time until they are prepared to make payment for a shipment of drugs and/or pay a debt owed for drugs previously received for distribution.

3. Furthermore, drug traffickers commonly carry large amounts of currency on their person, or maintain a large amount of currency in a location readily available to them. Because of the nature of maintaining and administrating a drug trafficking enterprise, it is common for drug proceeds from sales to be either carried by the individual trafficker on their person, or cached at a site where the funds are readily available to them. Further, drug traffickers commonly carry large amounts of currency on their person, or have the currency readily available in order to purchase or restock illicit drugs for distribution.

4. Based on my training and experience and the training and experience of other

Agents and Law Enforcement Officers with whom I have consulted, I know that persons who obtain income from illegal sources frequently structure their financial activities in such a manner as to hide and launder the proceeds by, among others, the following means:

    a) Creating entities that provide the façade of a legitimate business and source of income, through which proceeds from illegal sources can be laundered;

    b) Placing bank accounts in names of these business or other individuals through which to funnel money; and

    c) Structuring financial transactions in attempt to avoid Currency Transaction Reporting requirements.

5.    I submit this affidavit based on information known to me personally from the investigation, as well as information obtained from others who were directly involved in the matter or have personal knowledge of the facts contained herein. This affidavit does not include all the information known to me regarding this investigation, but only the information necessary to establish probable cause that the seized $443,495.00 in U.S. Currency is proceeds of, and was intended to be used or was used in furtherance of drug trafficking. I believe said property is also subject to forfeiture to the United States as proceeds of drug trafficking or property used or intended to be used to facilitate drug trafficking under 21 U.S.C. Section 881(a)(6) based on violations of 21 U.S.C. Section 841(a)(1).

6.    The $443,495.00 in U.S. Currency was seized from ANTONIO LAMAR WOODS and LOREN DIMITRI TAYLOR on July 20, 2020. Investigation revealed that WOODS has been documented in several investigations dating back to 2011, and further reveal that he has been involved in the distribution of controlled substances and assaults in Anchorage, Alaska. The information about WOODS contained in this affidavit come from investigator's

observations of WOODS at the Ted Stevens International Airport on July 20, 2020. Additionally, a query of the Anchorage Police Department internal records management system, TIBURON, displayed a criminal case against WOODS where he was the subject of a narcotics investigation during which he sold an undercover officer cocaine on at least three separate occasions in 2016. WOODS was convicted of a felony drug offense in the state of Alaska pursuant to AS 11.71.020(a)(1), (A)(2)(a) (possession with the intent to distribute and distribution of a Schedule IA or IIA controlled substance, to wit, cocaine) on 10/22/2018 (Court Docket 3AN-17-1114). In addition to the drug conviction, WOODS has several assault convictions.

8. LOREN DIMITRI TAYLOR does not have any criminal convictions in Alaska. An Interstate Identification Index (III) query was completed on TAYLOR which does not show any criminal history.

7. On July 20, 2020 at approximately 1030 hours, Investigator Presser, who was assigned as a Task Force Officer with the Anchorage Airport Interdiction Team, observed LOREN TAYLOR in the check-in area to Alaska Airlines. TAYLOR checked in for flight 94 which was scheduled to board at 1104 hours. Investigator PRESSER noted that TAYLOR had a single bag to check and did not have any carry-on luggage. The bag that TAYLOR was checking appeared new and TAYLOR checked in to his flight approximately 20 minutes before boarding time. TAYLOR did not immediately leave the check-in area for the security check point and instead remained on his cell phone and stood by the closed Starbucks kiosk. Investigator Presser believed that TAYLOR was waiting on someone as TAYLOR was continually looking around the terminal and talking on the phone. Due to COVID-19, there were not many travelers and the airport was not as busy as normal.

8. At the same time Investigator Presser was observing TAYLOR, Det. O'CONNOR and Sgt. CHAFFIN were in the Alaska Airlines baggage hold inspecting luggage checked on outgoing flights. Inv. PRESSER alerted Det. O'CONNOR and Sgt. CHAFFIN to the bag that TAYLOR had checked. The bag was located and removed from the carousel. The bag had an Alaska Airlines tag on it that showed it was routed to Los Angeles as its final destination, and the name on the tag was LOREN TAYLOR. There were no other markings on the bag. The bag also appeared to be very new and still had the plastic price tag hangar attached to it. It was determined through an airline manifest check that TAYLOR had a one-way ticket to Los Angeles and had purchased a ticket for WOODS as well, thought they were ticketed on separate reservations.

9. Sgt. CHAFFIN remained with the bag and Det. O'CONNOR went to the Alaska Airlines check in area where he observed TAYLOR standing by the Starbucks. Det. O'CONNOR noted that the time was approximately 1058, approximately six minutes before boarding was to begin. Det. O'CONNOR further observed that, despite how soon his flight was to board, TAYLOR was not yet making his way to his gate.

10. Det. O'CONNON continued to monitor TAYLOR as TAYLOR continued to stand in the check in area. TAYLOR was observed hanging up his phone and then briskly walking to the security check point where he met up with a male, later identified as ANTONIO WOODS. Both males attempted to enter security through the first- class line but were directed by TSA to go through the regular screening line. Det. O'CONNOR observed WOODS and TAYLOR in line together and speaking with one another.

11. Investigator PRESSER retrieved an IonScan device from the Airport Interdiction Team Office. Sgt. CHAFFIN and Investigator PRESSER conducted a "swab" of the exterior

5

of the bag that was checked by TAYLOR and the IonScan 600 alarmed for the presence of Cocaine residue. Sgt. CHAFFIN conducted the swab pursuant to his training, and the instrument was functioning properly. The IonScan is an electronic instrument that detects trace amounts of controlled substance residue. After performing the "swab" of TAYLOR's bag, Sgt. CHAFFIN located another roller bag checked by WOODS on the same flights as TAYLOR. The bag also appeared brand new and had plastic tag holders still attached. WOODS'S roller bag arrived in the baggage hold from check-in after the majority of the bags had already been taken by airline personnel to the aircraft, indicating that the bag was checked at or shortly before the check-in cut off time for the flight. A "swab" of WOODS' bag did not result in an alarm on the IonScan.

12. At approximately 1109 hours, Det. O'CONNOR and Investigator PRESSER contacted WOODS and TAYLOR as they were walking towards their departure gate at C6. Det. O'CONNOR contacted TAYLOR who stated the following in essence:

Det. O'CONNOR was in plain clothes and had his law enforcement tools concealed. After identifying himself to TAYLOR, Det. O'CONNOR advised him he was free to leave and he did not have to talk. When asked, TAYLOR stated that he was traveling to Memphis and explained he did not have any checked bags, and that he was traveling alone. Detective O'CONNOR knew this to be in direct contrast to what he had observed and what he knew to be true; specifically, TAYLOR had been seen closely associating with WOODS, he had checked luggage, and he was ticketed to Los Angeles. Det. O'CONNOR challenged TAYLOR on his statements. TAYLOR then recanted by saying he was actually going to Los Angeles to pick up his "auntie", and would then be traveling on to Memphis. While talking with TAYLOR, Detective O'CONNOR noted that TAYLOR was starting to sweat and his lips were quivering

6

and shaking. TAYLOR stated he purchased his flight to Los Angeles the day before and he used a debit card for the purchase. He eventually identified his travel companion as ANTONIO WOODS. Det. O'CONNOR was familiar with WOODS and knew he had been the target of drug investigations in the past. Det. O'CONNOR asked TAYLOR if he was carrying any drugs or currency and TAYLOR said he only had clothes in his bag. TAYLOR was asked again about currency and he said he had "about $8,000" in his checked luggage and that it belonged to him. Det. O'CONNOR observed a large bulge in TAYLOR'S front pocket and when asked about it, TAYLOR said it was about $900. TAYLOR told Det. O'CONNOR that he worked as a carpenter and was able to take leave for three weeks to visit Alaska. TAYLOR denied consent for a search of his luggage. TAYLOR was permitted to board his plane for Los Angeles.

12. Investigator PRESSER spoke with WOODS at the same time as Det. O'CONNOR spoke with TAYLOR. WOODS told Investigator PRESSER that he lives in Anchorage but travels to Los Angeles frequently to make music. WOODS said he arrived at the airport separately from TAYLOR and TAYLOR was traveling to Los Angeles to help him with his music business. WOODS consented to have Investigator PRESSER search his carry-on luggage but denied consent to search his checked luggage. During the search, Investigator PRESSER located jewelry that said "MGM" (Money Gang Music) and about $500 in cash in predominantly $20 bills. WOODS told Investigator PRESSER that he "did not recall" if there was any money in his checked bag and stated that he "did not remember putting any money in there." He also said he was unsure if he was carrying anything for anyone else. WOODS told Investigator PRESSER that he had purchased his own one way ticket to Los Angeles and would purchase another one way ticket when he was ready to return to Alaska. WOODS was allowed to leave and boarded his flight.

7

13. Based on the inconsistent statements, travel patterns by both WOODS and TAYLOR and the presence of cocaine residue on Taylors bag, Sgt. CHAFFIN seized both bags, applied for and was granted an Alaska state search warrant (3AN-20-2762SW) for the checked luggage for both WOODS and TAYLOR. The search warrant authorized the search of the luggage for the presence of controlled substances and evidence of controlled substance transactions, to include bulk currency.

14. At approximately 1515 hours Sgt. CHAFFIN, Det. O'CONNOR and Investigator PRESSER executed the search warrant on the luggage at the Airport Interdiction Office. Upon opening the bag that was checked by TAYLOR, investigators located several vacuum sealed bags containing a very large amount of US Currency that was banded in $5,000 denominations. The total amount of currency was $183,925.00. The manner of packaging (vacuum sealing) was consistent, based on the involved investigators' experience, with efforts to conceal the odor of controlled substances/currency to thwart drug detection canines used by law enforcement in airports.

15. At the same time, WOODS'S bag was searched pursuant to the warrant and investigators located a larger amount of bulk US Currency that was also vacuum sealed and banded in $5,000 increments. WOODS'S bag contained $259,570.00. In addition to containing the bulk currency, both bags contained clothing items that appeared brand new and many of the items still had the price tags attached.

16. In total there were 10 vacuum sealed bags between the two suitcases containing bulk US Currency totaling $443,495.00. The manner in which the currency was rubber-banded was also consistent, based on the involved investigators' experience, with how drug proceeds are regularly stored by drug traffickers.

17. A representative sample of the cash from both bags was "swabbed" utilizing the IonScan, and each time it alarmed for the presence of cocaine. The currency was ultimately transferred to the custody of the Drug Enforcement Administration (DEA).

18. An open source query of the internet revealed WOODS uses the moniker "TONY SWAG". Investigators located a YouTube Channel for "Tony Swag" where an individual, who the involved investigators recognized to be WOODS, is identifying himself as "Tony Swag" and is the lead in several rap videos. Of particular note, "Tony Swag" sings a song titled "Cocaine Bought Me Everything." In the song WOODS also identifies himself as "Tony Swag" and states "Tony Swag from the hood, cocaine bought me everything. I put ice on everything. I'm chasing dead presidents like a ghostbuster."

19. A search of Alaska Department of Labor indices showed that neither WOODS nor TAYLOR have ever been employed in the state.

20. Based upon the foregoing, I believe there is probable cause that the seized $443,495.00 U.S. Currency is proceeds of, and was intended to be used or was used to facilitate drug trafficking activities by TAYLOR and WOODS and subject to forfeiture to the United States, pursuant to Title 21, United States Code Sections 881(a)(6).

I declare that the foregoing is true and correct to the best of my knowledge and belief.

EXECUTED on December  18 , 2020 in Anchorage, Alaska

*David A. Rose* /s/

Special Agent
Drug Enforcement Administration

Subscribed and sworn to me before this __18__ day of December, 2020, in Anchorage, Alaska

_____ Sara Norman
NOTARY PUBLIC, State of Alaska
My commission expires: With office

